UNITED STATES DISTRICT COURT
EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

TEENA MARIE CREAGER,

                        Plaintiff,                Civil Action No.: 12-cv-12852
                                                    Honorable Julian Abele Cook
                v.                          Magistrate Judge David R. Grand

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

                        Defendant.

_____/

## <u>REPORT AND RECOMMENDATION</u><br><u>ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [12, 15]</u>

Plaintiff Teena Creager brings this action pursuant to 42 U.S.C. § 405(g), challenging a final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions which have been referred to this court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## I.      RECOMMENDATION

For the reasons set forth below, the court finds that remand is warranted for the ALJ to consider new evidence not available at the time of the administrative proceeding, specifically records of Creager's neurosurgeon.  Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment [15] be DENIED, Creager's motion [12] be GRANTED TO THE EXTENT THAT IT SEEKS REMAND UNDER SENTENCE 6, BUT DENIED TO THE EXTENT THAT IT SEEKS REVERSAL AND AN AUTOMATIC AWARD OF BENEFITS, and that, pursuant to sentence six of 42 U.S.C. § 405(g), the Commissioner's

decision be REMANDED for further consideration consistent with this Report and Recommendation.

## II.   REPORT

### A.   Procedural History

On June 17, 2009, Creager filed an application for DIB, alleging disability as of February 1, 2008. (Tr. 105-110). The claim was denied initially on September 16, 2009. (Tr. 48-49). Thereafter, Creager filed a timely request for an administrative hearing, which was held on September 30, 2010, before ALJ John D. McNamee-Alemany. (Tr. 32-47). Creager, represented by attorney David Stewart, testified, as did vocational expert ("VE") Pauline Mceachin. (*Id.*). On December 10, 2010, the ALJ found Creager not disabled. (Tr. 18-31). On May 15, 2012, the Appeals Council denied review. (Tr. 1-6). Creager filed for judicial review of the final decision on June 28, 2012. [1].

### B.   Background

#### 1.   *Disability Reports*

In an undated disability report, Creager reported being 5 feet 1 inch tall and weighing 200 pounds. (Tr. 120). She reported that the conditions preventing her from working were "[b]ack and leg pain, bilateral elbow pain, fatigue, [and] hip problems." (*Id.*). She reported that her conditions prevent her from sitting, standing or walking "any length of time or distance," and that she cannot lift or carry weight over five pounds. (*Id.*). Her conditions first rendered her unable to work on February 1, 2008. (*Id.*). She reported that she stopped working as a truck driver because she needs to "lay down to relieve pressure" after about five or six hours and because she "could no longer do clutching because of leg pain." (*Id.*). Creager reported seeing several doctors, although only one doctor treated the conditions for which she alleged disability.

(Tr. 124). She reported being treated in the emergency room in 2002 and 2008 for "[w]hip lash, and severe back pain." (Tr. 125). She also reported being prescribed Motrin for her pain. (*Id.*).

In an undated function report, Creager reported that her day consists of making coffee, sitting and watching television, making phone calls, showering, dressing, eating lunch and then by 2 p.m. lying down for about three hours due to pain. (Tr. 143). After that she tries to do light housework, starts dinner, eats, watches some more television and then goes to bed around 10 p.m. (*Id.*). She falls asleep by about 1 a.m., and is up every two hours due to pain. (*Id.*). She reported caring for two dogs by letting them out to use the bathroom, but that her daughter fills their food and water. (Tr. 144). She reported that her hobbies had included horse-back riding, gardening, sewing, chores and cooking, but that she cannot do those activities now. (*Id.*; 147). She also reported that her pain affects her ability to sleep. (*Id.*).

Creager reported no difficulty with personal care except that her daughter shaves her legs and gives her pedicures. (*Id.*). Her ability to cook is "limited to simple tasks" and her daughter "does the rest" including retrieving food, pans and utensils. (Tr. 145). She reported that cooking lunch and dinner takes her between 10 minutes and an hour, but that she cannot sit or stand for more than 10 minutes. (*Id.*). She is able to do personal laundry, some sewing, and dishes. (*Id.*). Laundry takes her two hours. (*Id.*). She can sew for 30 minutes at a time and can wash the dishes for ten minutes. (*Id.*). She does not perform yard work because "it hurts to push or pull anything," stand or sit for a long period of time, and the vibration of the mower causes pain. (Tr. 146). She is able to drive and ride in a car, and she can go out alone. (*Id.*). She shops once a week for food, clothes and other products, generally taking three to four hours. (*Id.*). She enjoys visiting friends and dining out about once a month, and talks on the phone daily. (Tr. 147).

Creager reported that her conditions affect her ability to lift, squat, bend, stand, reach,

3

walk, sit, kneel, climb stairs, complete tasks, concentrate, understand, and follow instructions. (Tr. 148). She reported being able to lift 5 pounds, stand for five minutes, walk slowly for 200 feet or fast for 50 feet, sit ten minutes, walk ten stairs slowly, bend for ten seconds, kneel for one minute, and reach only low things. (*Id.*). She cannot squat. (*Id.*). Completing tasks takes two to three times longer than usual, and her ability to understand and follow instructions is affected by her pain. (*Id.*). She reported using electric carts to get around stores. (*Id.*).

In an undated disability appeals report, Creager reported that her pain had worsened since May 2009, "making it harder to do all tasks throughout the day." (Tr. 154). She reported that the pain made it "harder to stay focused on any tasks." (*Id.*). She did not report any additional treatment or medications prescribed due to the worsening of her condition. (Tr. 155-56).

### 2.    *Plaintiff's Testimony*

At the hearing, Creager testified that she weighs 205 pounds and is 5 feet 1 inch tall. (Tr. 35). She testified that she uses a cane for balance and support, but was not prescribed it by a doctor. (Tr. 35-36). Creager testified that her pain begins in the middle of her back, progressing to her lower back and over her hips into her legs, causing tingling and numbness in her legs. (Tr. 36). She can only relieve the pain through medication and she was currently taking "Lorcets [sic] 750s," specifically two-and-a-half of them at a time, every four to five hours. (Tr. 36-37; 40). She testified that she would be asking for something stronger the next time she visits her doctor. (Tr. 36). In addition to Lorcet, she takes Flexeril, Valium and Prednisone. (Tr. 39). Her medications can make her feel physically capable, but also cause her to forget things, feel foggy and slur her speech. (Tr. 37; 40). The ALJ observed and commented on her slurred speech and slowness at the hearing, and Creager testified that it was the result of the Lorcet. (Tr. 40).

Creager testified that she can lift no more than five pounds, but that she cannot carry even

4

that amount.  (Tr. 44).  She can walk about a half a block before her legs and her back start hurting and tingling, and she has much difficulty with crouching, stooping and kneeling.  (Tr. 37).  She also cannot stand for more than three or four minutes and she can sit for only five to ten minutes before needing to change position.  (Tr. 41).  She also has problems with stairs.  (Tr. 42). She testified that her most comfortable position is lying down, which she does daily from 2 p.m. until about 5 p.m.  (Tr. 41).  She is generally able to sleep through the night when taking Flexeril, but she will sometimes also take Melatonin to aid sleep.  (Tr. 42).  Creager testified she can perform household chores, but they take her all day and not all of them can be completed every day.  (Tr. 37-38).  She testified she cannot vacuum, and while she can shop, she must use an electric cart if she is in a big store.  (Tr. 42).

### 3.      Medical Evidence

#### a.      Treating Sources

Creager provided a number of treating records, some of which are dated long before her alleged onset date and are related to conditions not at issue here.  For purposes of this Report and Recommendation, the Court will only discuss those records to the extent they have some relevance to the issues at hand.

In patient questionnaires filled out on March 26 and March 27, 1997, pursuant to an unrelated procedure, Creager reported suffering from arthritis and back trouble, but did not report taking any medication for her pain.  (Tr. 372; 388).  A February 20, 1998 x-ray of Creager's lumbar spine revealed only "[m]inimal scoliosis of the left."  (Tr. 327).  In a March 2, 1998 patient questionnaire filled out pursuant to an unrelated surgery, Creager reported suffering from arthritis in her back, and taking Tylenol 500 mg twice a day.  (Tr. 313).  Creager was treated in the emergency room on November 4, 2002, for neck and back pain as the result of a

car accident.  (Tr. 264-74).  She rated her pain 5-6 on a scale of 10.  (Tr. 267).  Upon examination she had no vertebral tenderness, and had a normal range of motion in all extremities.  (Tr. 266).  An x-ray taken revealed degenerative changes in her cervical spine, but no evidence of an acute fracture or subluxation.  (Tr. 272).  She was diagnosed with a neck sprain and given Toradol for pain.  (Tr. 266-267).

Creager was treated in the emergency room on February 6, 2008, for thoracic back pain that began after lifting a bale of hay.  (Tr. 238-63).  Upon examination, she was noted to be in moderate distress, with tenderness in the paraspinous region of her thoracic vertebrae.  (Tr. 240).  Her pain was a 9 on a scale of 1-10.  (Tr. 241).  She was diagnosed with an acute thoracic sprain, intravenously given Toradol, Dilaudid and Valium to control her pain, and subsequently sent home with Vicodin.  (Tr. 242-43; 261).

The next day, on February 7, 2008, Creager was again treated in the emergency room for thoracic back pain.  (Tr. 220-37).  She reported having had an x-ray and CT scan the previous week which were negative.  (Tr. 221).  She also reported chronic back problems, reoccurring pain requiring Lorcet shots which were easier on her stomach.  (*Id.*).  Upon examination, Creager was found to be in mild distress with tenderness and muscle spasms in her thoracic region accompanied by parasthesis.  (Tr. 222).  Her gait was within normal limits.  (Tr. 223).  She was diagnosed with a thoracic muscle strain and intravenously given Rofran, Dilaudid, and Protonix.  (Tr. 224-25).  Afterwards, she reported being pain free.  She was given another dose of Rofran before discharge.  She was prescribed Lorcet.  (Tr. 225-26; 235).

Creager was seen by her primary physician, Dr. Jules Reinhardt on January 29, 2009, complaining of mid- and lower-back pain that traveled to her hips and legs.  (Tr. 205).  Her pain was a 4-5 on a scale of 10 and it had been progressing in the last four years.  (*Id.*).  She reported

difficulty standing longer than five minutes, that the pain increased to a 10 when standing, and that it made her legs feel weak. (*Id.*). She reported being unable to use the body motions required to drive a semi-truck. (*Id.*). Dr. Reinhardt diagnosed her with back pain – long term, and ordered x-rays and an MRI. (Tr. 206). A nurse's note from February 3, 2009, revealed a conversation with Creager suggesting that she call around and compare prices on x-rays and that the doctor's office would fax the order when she decided on a facility. (Tr. 207). There are no further records from Dr. Reinhardt.

Creager began treatment with Dr. Galen Ebert on March 17, 2010. (Tr. 195). Creager complained of shooting pain down her right leg, mid- and lower-back pain and right shoulder pain. (*Id.*). She reported having had this pain "her entire adult life," and that it "keeps her awake." (*Id.*). Upon examination Creager had a decreased range of motion in her lumbar region, as well as decreased flexion. (*Id.*). She was diagnosed with multiple areas of pain and prescribed Lortab, Predisone, Valium and Celebrex. (*Id.*).

At an August 4, 2010 follow-up, Creager complained of right shoulder, arm and back pain. (Tr. 194). Upon examination, Dr. Ebert noted a decreased range of motion in Creager's lumbar region and decreased flexion. (*Id.*). He diagnosed her with multiple areas of pain, and continued her Lortab dosage. (*Id.*). He increased her Valium dosage, continued her Prednisone, and added Anaprox for arthritis. (*Id.*). Dr. Ebert also made a notation about suggesting x-rays and a possible CT/MRI scan. (*Id.*). At an August 31, 2010 follow-up, Creager complained of pain in her back, and her right hip, knee, and shoulder. (Tr. 209). Upon examination she had a decreased range of motion in her lumbar spine and decreased flexion. (*Id.*). Dr. Ebert diagnosed her with multiple areas of pain, "likely osteoarthritis." (*Id.*). He increased her Prednisone dosage, continued her Anaprox and added a prescription of Flexeril. (*Id.*). He also ordered x-

7

rays of Creager's right hip, knee and shoulder, as well as her lumbar and thoracic spine. (*Id.*).

X-rays taken on September 2, 2010, of Creager's lumbar spine revealed mild scoliosis, degenerative disc disease at L2-L3 and degenerative facet arthritis at L4-L5 and L5-S1. (Tr. 210). X-rays of her thoracic spine showed "[n]o evidence of acute bony abnormalities involving the thoracic spine" but "[d]egenerative disc disease at the C5-6 and C6-7 cervical levels." (Tr. 213). X-rays of Creager's right hip, knee and shoulder were generally unremarkable. (Tr. 211-12; 214). At a follow-up with Dr. Ebert on September 7, 2010, Creager's x-rays were reviewed and she was referred to Dr. Gerald Schell, a neurosurgeon, for "evaluation, treatment and recommendations." (Tr. 208; 413).

Dr. Schell's records were not available to, and therefore not reviewed by the ALJ. Creager was first evaluated by Dr. Schell on November 3, 2010, after the date of her September 30, 2010 disability hearing, but before the ALJ's December 10, 2010 decision.[1] (Tr. 413). Dr. Schell examined Creager, finding that she "seem[ed] to walk with an antalgic gait." (*Id.*). She also had a positive straight leg raising test and "changes in dorsiflexion plantar flexion in an L5 distribution." (*Id.*). He determined that Creager had "problems with severe pathology in the lumbar spine," and ordered an MRI. (*Id.*). An MRI taken on November 19, 2010, revealed "a herniated disc laterally on the right at L4-5 within the intervertebral foramen compromising the

---

[1] Although the Commissioner does not dispute that good cause exists for Creager's failure to submit these records to the ALJ, the Court notes that Creager did promptly attempt to obtain and submit these records shortly after treatment. Creager was seen by Dr. Schell first on November 3, 2010, with a follow-up on November 24, 2010, after she underwent an MRI. (Tr. 412-13; 418-19). Creager's attorneys sought Dr. Schell's records in a letter dated November 30, 2010, which was stamped as being received by Dr. Schell's office on December 2, 2010. (Tr. 411). While it is unclear when Dr. Schell sent the records to Creager's counsel, counsel sent the records to the Social Security Administration on December 13, 2010, three days after the ALJ rendered her decision. (Tr. 410). Indeed, she may have not even received the ALJ's opinion in the mail at the point she submitted these records, as evidenced by the fact she addressed her submission letter to the adjudication officer, rather than the Appeals Council. (Tr. 410).

existing [nerve root]."[2]  (Tr. 418-19).  It also revealed "[s]ignificant spinal canal stenosis at L4-L5 and mild canal stenosis at L2-3," "[a]symmetric disc bulging on the left at L2-L3," and "[d]iffuse lumbar degenerative disc disease, spondylosis and facet degenerative changes and osteopenia." (Tr. 419).  At a November 24, 2010 follow-up, Dr. Schell reviewed Creager's MRI findings, noting that they revealed "high-grade lumbar stenosis."  (Tr. 412).  Creager reported feeling that her symptoms had been worsening.  (*Id.*).  Upon examination, she was found to walk with a "severe antalgic gait," had a positive straight leg raising test and dorsiflexor weakness.  Her sensory changes "are in the L5 distribution."  (*Id.*).  Dr. Schell diagnosed her with "[s]evere lumbar spinal canal stenosis, intractable radiculopathy, [and] pain."  (*Id.*).  Dr. Schell agreed that Creager could continue conservative treatments which might include epidural injections, but he also stated that "because of the severity of her lumbar stenosis, I do believe that she would be a candidate for a decompressive lumbar surgery.  (*Id.*).  In additional records which were submitted in the first instance to the Appeals Council, Creager noted that she underwent a discectomy and fusion at the L4-L5 level on November 15, 2011.  (Tr. 425-31).

### b.    Consultative and Non-Examining Sources

On September 9, 2009, Creager was evaluated by Dr. Siva Sankaran for the State of Michigan.  (Tr. 172-79).  Creager reported that she had suffered from fatigue and back pain since the age of 13, when she was crushed between a horse and a barn beam.  (Tr. 172).  She was not x-rayed at the time, but in 1996 or 1997 she was x-rayed and it was determined she had a fourth or fifth lumbar vertebrae fracture.  (*Id.*).  She reported increased fatigue recently, as well as a 70-80 pound weight gain over the last six or seven years since she stopped working.  (*Id.*).  She also

---

[2] The impression section of the MRI results appear to be incomplete, as they end the findings stating that the herniated disk was "within the intervertebral foramen compromising the existing." (Tr. 419).  However, in the findings portion of the MRI results, it is clear that the term "existing" was intended to modify the term "nerve root."  (Tr. 418).

reported stress and depression due to financial issues.  (*Id.*).  She has elbow pain that appears when peeling vegetables, and hip pain for the last year and a half that occurs when ascending or descending steps, or when trying to squat or kneel.  (*Id.*).  Creager reported being able to walk a half a block before stopping due to pain.  (Tr. 172-73).  She has difficulty squatting, kneeling and lifting.  (Tr. 173).  She does light cooking, but her husband and daughter do everything else. (*Id.*).  Creager complained of occasional numbness in both legs up to the thigh and reported that she takes five extra strength Tylenol four times a day for pain (approximately 20 pills a day). (*Id.*).  She reported that this controls her pain "to a great extent."  (*Id.*).  She reported no "injection treatments, physical therapy or exercise recently."  (*Id.*).  She also believed she has restless leg syndrome though she had not been diagnosed for it.  (*Id.*).

Upon examination, Creager was found to weigh 223 pounds.  (*Id.*).  She was "ambulatory without any walking aid," and had "[n]o tendency for lurching, swaying or falling."  (Tr. 174). When asked to touch her toes, she bent and said "I cannot do it anymore."  (*Id.*).  When asked to squat she said "are you crazy?"  (*Id.*).  She squatted half-way and then stated she could no longer do it due to back pain.  (*Id.*).  Dr. Sankaran found that Creager had normal range of motion in her hip joints and knees, and that her lumbar area was "slightly tender" with "[m]uscle spasms present."  (*Id.*).  A straight-leg raising test was negative. (*Id.*).

An x-ray of her lumbar spine showed normal intervertebral space with "some facet arthritis seen on L4, L5 and L3, L2 area."  (*Id.*).  There was also "a compression fracture of the T11 vertebra noted from the previous injury," and "some levoscoliosis of the lumbar spine to the left present."  (*Id.*).  An x-ray of her right hip "shows some narrowing of the joint space as well as thickening of the acetabular margin, suggestive of osteoarthritis, mild to moderate degree." (*Id.*).  An x-ray of her left hips showed "thickening sclerosis of the acetabular margin and also

10

narrowing of joint space on the lower 1/3 of the hip joint, suggestive of osteoarthritis." (*Id.*). Dr. Sankaran had no medical records to review. (Tr. 175). He concluded:

> After examination and no chart to review, it appears that this patient is obese. She has gained about 70 or 80 pounds in the last 7 ½ years since she quit working . . . She has normal range of motion in the elbows, hips, as well as the knees. She has decreased range of motion of the lumbar spine. She has moderate degenerative arthritis of the hip joint without any restriction. She has fatigue due to multifactorial depression, obesity and financial stress factors.

(Tr. 175). Dr. Sankaran reported that Creager's current abilities included an ability to sit, stand, carry, push, and pull without restriction, but that she could only bend, stoop, or squat ¼ of the way due to leg and back pain. (Tr. 178). She also had some difficulty climbing stairs. (*Id.*). Dr. Sankaran reported that his examination did not reveal the need for a walking aid. (Tr. 179). He did not complete a residual functional capacity ("RFC") assessment for Creager.

Instead, on September 16, 2009, a non-examining decision-maker completed an RFC assessment for Creager based on review of her records and Dr. Sankaran's examination, and found Creager capable of lifting 20 pounds occasionally and 10 pounds frequently. (Tr. 181). Creager was also able to stand or walk six hours of an eight-hour day, and sit the same amount of time. (*Id.*). She had unlimited ability to push or pull. (*Id.*). She could frequently balance, but only occasionally stoop, kneel, crouch or crawl, or climb ramps, stairs, ladders, ropes or scaffolds,. (Tr. 182). The decision-maker based her RFC on the fact that Creager only saw her primary physician once in 2009 and did not receive prescription medications at that time. (*Id.*). She also based her decision on Dr. Sankaran's examination. (*Id.*). She concluded that Creager was "fairly credible now[,] even though [she] does not have ongoing medical care and nothing to document onset." (Tr. 185).

11

4.    *Vocational Expert's Testimony*

The ALJ posed the following hypothetical to VE Mceachin at the hearing:

> I have a person closely approaching [advanced] age, with high school
> education and no transferrable skills and could perform light work.  She
> cannot tolerate high production stress, so rule out assembly line or quota,
> quota-driven jobs.  Standing and walking is 30 minutes at a time and a
> total of four hours in an eight-hour day.  Sitting is six hours in an eight-
> hour day but requires the sit and stand option every 30 minutes without
> leaving the workstation.  And this will be about one minute each time to
> allow stretching.  The following are [occasional]: climbing stairs and/or
> ramps, stooping, kneeling, crouching.  Can never climb ladders or
> scaffolds.  Can frequently balance, cannot work in unprotected heights.
> Must avoid even moderate exposure to dangerous moving machinery.

(Tr. 43-44).  The ALJ then asked the VE if there were jobs in the national economy that such a

hypothetical claimant could perform.  (Tr. 44).  The VE testified that the hypothetical limitations

would erode the number of light jobs available.  (*Id.*).  She testified that a claimant with those

limitations would still be able to perform the jobs of visual inspector (500 positions in the

regional economy), information clerk (200 positions), and general office clerk (2,000 positions).

(*Id.*).   Creager's counsel then asked whether those jobs would still be available if the

hypothetical claimant needed to lie down for three hours a day.  (Tr. 45).  The VE testified that

they would not.  (Tr. 45-46).  Counsel then asked if those jobs would still be available if the

hypothetical claimant could stand for less than four hours a day, "maybe two hours."  (Tr. 46).

The VE testified that such a limitation would, by definition, preclude light work.  (*Id.*).

## C.    **Framework for Disability Determinations**

Under the Act, DIB is available only for those who have a "disability."  *See Colvin v.*

*Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the

> inability to engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to result in
> death or which has lasted or can be expected to last for a continuous period of not
> less than 12 months.

12

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*Schueuneman v. Comm'r of Soc. Sec.*, No. 11-10593, 2011 U.S. Dist. LEXIS 150240 at *21 (E.D. Mich. Dec. 6, 2011) *citing* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.    The ALJ's Findings

Following the five-step sequential analysis, the ALJ concluded that Creager was not disabled. At Step One he determined that she had not engaged in substantial gainful activity since her alleged onset date. (Tr. 23). At Step Two he found the following severe impairments:

13

"obesity, moderate bilateral hip osteoarthritis, and degenerative arthritis of the lumbar region of the spine." (*Id.*). At Step Three he determined that none of her impairments, either alone or in combination, met or medically equaled a listed impairment, specifically analyzing her impairments against the requirements of Listings 1.02 (Major dysfunction of a joint) and 1.04 (Disorders of the spine). (Tr. 23-24). The ALJ then assessed Creager's RFC, finding her capable of performing

> light work . . . except that she cannot tolerate high-production stress, including assembly line or quota-driven jobs; she can stand/walk for 30 minutes at a time and a total of four hours in an eight-hour workday; can sit for six hours in an eight-hour workday, but requires the sit/stand option every 30 minutes without leaving the workstation (for about one minute of stretching each time); she can perform occasional climbing of stairs and ramps, stooping, kneeling, and crouching. However, the claimant can never climb ladders of scaffolds. She can frequently balance, but she cannot work in unprotected heights and must avoid even moderate exposure to dangerous moving machinery.

(Tr. 24). At Step Four the ALJ found that, based on her RFC, Creager could not engage in any of her past work. (Tr. 27). At Step Five, the ALJ concluded that, based on her RFC and VE testimony, there were a significant number of other jobs in the national economy that Creager could perform such that she was not disabled under the Act. (Tr. 28-29).

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not

remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the Court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations

15

omitted).

**F.    Analysis**

Creager makes several arguments alleging that the ALJ erred in his analysis of her disability status.  She also makes a very perfunctory argument, primarily in her reply brief, for remand pursuant to Sentence 6 of the Act for the consideration of new evidence, specifically Dr. Schell's records.  Despite the brevity of her argument, the Court finds, for the following reasons, that a remand pursuant to Sentence 6 is warranted here.  As a result, the court need not address the remainder of Creager's arguments, which may turn, in any event, on the ALJ's consideration of Dr. Schell's records.

*1.    Sentence 6 Remand*

Sentence six of § 405(g) addresses situations where a claimant submits new evidence that was not presented to the ALJ but that could alter the ALJ's ultimate decision.  Sentence six of § 405(g) provides, in relevant part:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding; and the Commissioner of Social Security shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm the Commissioner's findings of fact or the Commissioner's decision, or both . . . .

42 U.S.C. § 405(g); *see also Willis v. Sec'y of Health & Human Servs.*, 727 F.2d 551, 554 (6th Cir. 1984).  "Good cause" requires that the claimant demonstrate "a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2002).  The Sixth Circuit has held that for new evidence to be material there must be "a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence."

16

*Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 712 (6th Cir. 1988).

Although Creager does not specifically argue for remand under Sentence 6 in her principal brief, she does argue how Dr. Schell's records would have been material had they been available to the ALJ. [12 at 3]. Despite no specific argument by Creager on the subject of newness or good cause, the Commissioner, in her response brief, does not raise the issue of waiver; instead she specifically concedes that Dr. Schell's records are new and that good cause exists for Creager's failure to provide them at the administrative proceeding. [15 at 10-11]. The Commissioner then goes on to argue that, despite this, remand is not required because the records are not material. [*Id.* at 11-12]. In her reply brief, Creager points out the Commissioner's concessions, and again argues the records' materiality. [16 at 4]. Hence, despite her failure to properly raise the argument in her initial brief, the court finds that the Commissioner was (and considered herself) sufficiently on notice of the argument regarding remand as demonstrated by her complete response to it. Therefore, the court finds the issue adequately briefed, accepts the Commissioner's concession on the issues of newness and good cause, and finds that the only question remaining is whether there is a "reasonable probability" that had Dr. Schell's records been before the ALJ, he would have reached a different disposition. *Sizemore*, 865 F.2d at 712. The court finds that such a reasonable probability exists here.

The ALJ's RFC assessment was based on a lack of objective medical evidence of an impairment that would severely affect Creager's ability to, among other things, stand and walk. (Tr. 25-27). He specifically cited the lack of treating records, the mostly normal finding of her x-rays, and the fact that her treating physician had prescribed an essentially conservative treatment regimen consisting of a stable course of medication, rather than recommending additional or

increased dosages of medications, physical therapy or surgery.[3] (*Id.*).  The ALJ further found Creager's credibility lacking, noting that her reported activities of daily living conflicted with the available objective medical evidence.  (Tr. 26-27).

Based on the ALJ's rationale, a reasonable probability exists that his determination would have been different if he had access to Dr. Schell's evaluation and the concurrent MRI findings. As noted above, the MRI of Creager's lumbar spine which was not before the ALJ showed "significant spinal canal stenosis" and a "herniated disc laterally" at L4-5 that compromised an existing nerve root.  (Tr. 418-19).  Coupled with Dr. Schell's findings that Creager walked with a severe antalgic gait, and had a positive straight-leg raising test, radiation of pain down her leg, a foot that "does drag on her," and sensory loss, (Tr. 412), a reasonable probability exists that the ALJ would have found at least that Creager's impairments further constrained her RFC, if not caused her to meet or medically equal a listed impairment (specifically Listing 1.04).[4]  Even if considering this evidence would have only affected Creager's RFC, a reasonable probability exists that the ALJ would have found her ability to stand and/or walk eroded to the point that she would have been rendered disabled, either through application of the Medical Vocational Guidelines or by VE testimony, specifically in light of her age at the time of decision.

At the time of the hearing, Creager was 54 years old, making her a person "closely

---

[3] As Creager points out, the ALJ was incorrect in his analysis of her primary physician's records. As the discussion of Dr. Ebert's records above reflects, Dr. Ebert did, on more than one occasion, increase Creager's mediation dosage, and, while not recommending surgery himself, did refer Creager to a neurosurgeon for consultation.  (Tr. 194-95; 208-209).

[4] Listing 1.04 requires, in pertinent part, spinal stenosis with "evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine . . . and, if there is involvement of the lower back, positive straight-leg raising test," or "[l]umbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively."  20 C.F.R. pt. 404, subpt. P, app. 1, Listing 1.04.

approaching advanced age." 20 C.F.R. § 404.1563. Such individuals, who, like Creager, "have

no past work experience or can no longer perform vocationally relevant past work and have no

transferrable skills," and who are found by the ALJ to be limited to only sedentary work, are

automatically considered disabled pursuant to application of the Medical Vocational Guidelines.

20 C.F.R. pt. 404, subpt. P, app. 2, 201.00(g). In his RFC assessment, the ALJ limited Creager

to standing and/or walking a maximum of four hours a day, in 30 minute intervals. (Tr. 24).

This is less than the amount of standing/walking required for the full range of light work and the

VE testified that Creager's RFC "erode[d] the number for light jobs." (Tr. 45). There exists a

reasonable probability that consideration of Dr. Schell's records would have caused the ALJ to

further limit Creager's ability to stand or walk, possibly to the point that she would be limited to

only sedentary work[5] which would automatically direct a finding of disabled.[6] Hence, her age at

the time of the hearing magnifies the impact the introduction of these records might have had on

the ALJ's ultimate determination. While the court cannot say that this evidence necessarily

would have caused the ALJ to find Creager disabled for the entire period dating back to her

alleged onset date, there is at least a reasonable probability that he would have found her

---

[5] Sedentary work is work that involves occasional standing and walking, which "should generally total no more than about 2 hours of an 8-hour workday." SSR 83-10, 1983 SSR LEXIS 30, *13 (1983). The full range of light work requires "a good deal of walking or standing" or "approximately six hours of an 8-hour workday." *Id.* at*14. Creager was found by the ALJ to be capable of performing a limited amount of light work, as he restricted her to only four hours of standing and/or walking, in 30 minute increments, which eroded the number of light jobs available to her, according to the VE's testimony. (Tr. 24; 45). Thus, a question exists whether the light jobs the VE identified as being available to Creager would still be available if the ALJ had found her only capable of standing and/or walking for some lesser period of time.

[6] Indeed, while the VE's testimony on this point is not entirely clear, he arguably testified that if Creager were limited to something less than four hours of standing or walking, the entire base of light work might be eliminated. (Tr. 46). At the very least, remand is necessary to identify what effect (if any) a more restrictive RFC would have on the already eroded base of light work Creager was found capable of performing.

disabled for some period of time between her alleged onset date and the date of his decision. That is all that is required for remand to be appropriate. *Sizemore*, 865 F.2d at 712.[7]

For all of the above reasons, the Court finds Dr. Schell's records material, and recommends that the case be remanded back to the ALJ for consideration of these records and reconsideration of Creager's credibility based on this newly obtained objective medical evidence.

## III.    CONCLUSION

For the foregoing reasons, the court **RECOMMENDS** that Creager's Motion for Summary Judgment **[12]** be **GRANTED TO THE EXTENT THAT IT SEEKS REMAND UNDER SENTENCE 6, BUT DENIED TO THE EXTENT THAT IT SEEKS REVERSAL AND AN AUTOMATIC AWARD OF BENEFITS**, the Commissioner's Motion **[15]** be **DENIED** and this case be **REMANDED** for consideration consistent with this Report and Recommendation.

Dated: June 21, 2013                    s/David R. Grand
Ann Arbor, Michigan                     DAVID R. GRAND
                                        United States Magistrate Judge


### NOTICE TO THE PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and

---

[7] The Commissioner argues that the records post-date the ALJ's decision, making them immaterial to the issue of Creager's condition during the disability period. (Doc. #15 at 14). To the extent the Commissioner is referencing Dr. Schell's evaluation of Creager's condition and her concurrent MRI results, the Commissioner is mistaken. While the November 2010 records post-date the September 30, 2010 administrative hearing, they pre-date the ALJ's December 10, 2010 decision. To the extent the Commissioner is referring to the records regarding Creager's 2011 back surgery, those records do post-date the ALJ's decision, and thus cannot, standing alone, show a decline in her condition during the relevant period. However, for the reasons discussed above, the November 2010 records alone prompt this Court's finding that a reasonable probability exists that reconsideration of Creager's case could cause the ALJ to find her disabled for some, if not all, of the period in question. The ALJ, on remand, may find it helpful to also consider the 2011 records in his analysis, but the Court does not find them necessary to the determination of Creager's condition at the time of his decision.

Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir.1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir.1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir.1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir.1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

### <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 21, 2013.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager